## WARD et al. *v.* WARFIELD et al.

The obligation of an agent, whose authority is limited by instructions, is, to adhere faithfully to those instructions. If he unnecessarily exceed his commission, or risk the effects of his principal without authority, he renders himself responsible to the latter for the consequences of his act. If loss ensue it is no defence that he intended the benefit of his principal. But subsequent assent, as between principal and agent, is equivalent to a previous authority; hence where an agent has committed a breach of orders, and the principal with full knowledge of all the circumstances, adopts his acts, even for a moment. he will be bound by them, and the agent discharged. Such assent need not be express; it may be inferred from the conduct of the principal.

Where a principal has employed a factor either to buy or to sell, and the factor, acting in good faith, has departed from his instructions, and has so informed his principal, the latter will be bound to notify the agent of his repudiation of the act, within a reasonable time after being informed of it, or he will be presumed to have adopted the transaction, and the loss, if any, will fall on him.

Where a factor, to whom cotton had been consigned for sale in the city in which he resided, in consequence of low prices, ships it to a foreign market, and notifies his principal of the fact and of his motive for doing so, offering to him the alternative of taking the cotton at a valuation placed on it before shipping, or the chances of the foreign market; and the latter, instead of replying at once, postponed his answer for several days, until, after the receipt of foreign news, he had ascertained that the shipment would prove unprofitable, when he notified the factor of his intention to take the price of the home valuation, the principal will be held to have assented to the shipment, and the loss will fall upon him.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge,* J. The facts of this case are stated at length in the opinion delivered by *Slidell,* J. *infra.* The judge of the District Court rendered a judgment in favor of the plaintiffs against *T. B. Warfield* for the sum of $2643 33, with interest at five per cent a year, from 12 March, 1844, till paid, and costs; and in favor of *Curneal* for $159 21, with interest at five per cent, from 30 April, 1844, with costs. The reasons for this judgment are stated by him, as follows:

"This case involves the application of a well settled principle of agency, which is simply this: That the acts of one or the other party, when disclosed to his correlative, should by promptly avowed or disowned. For authorities, in addition to those quoted from Story's treatise on Agency, I refer to 3 Pit. Rep. 69. 1 Brock. Rep. 86. It has often been recognized in our State decisions. See 4 La. 542. 11 La. 288. 16 La. 51, 471. 18 La. 18. And it is recognized in the textual provisions of our Code. Arts. 1811, 2958,

" That the act of shipping the cotton was unauthorized, there is no doubt; and there is as little, that defendants were not bound to accept either alternative proposed to them; but their defence is not placed on this ground, as they insist that they did elect to take the valuation made. The cotton was shipped on the 7th March, the account made up on the 12th, advice of the whole forwarded on the 27th, and it is admitted to have been received at Bachelor's Bend, Mississippi, on or before the 5th of April by *T. B. Warfield*, the acting partner. The answer, electing the valuation, was not made until the 9th of May, and is dated at Cincinnati. Was this done within a reasonable time? I am of opinion that it was not. No explanation of their silence is offered, and, in the meantime, the price of cotton had materially declined. In the meantime a correspondence had taken place between plaintiffs and *Carneal*, one of the partners. He received information of what had been done. before the 23d of April, but did not make his election until the 30th, and then under very suspicious circumstances, it being in proof that news from England, by the Acadia, showing a still greater decline, was received in Cincinnati on the 29th. But the account-current furnished by plaintiff shows that, at a date not precisely fixed, but evidently made in a different writing, and after the account had been closed on June 1st, his balance of $1640 46 was carried to his private account, apparently in pursuance of his letter of May 30th. This is, I think, a severance of the joint interest, and an acquiescence in his choice to take the valuation."

On a rule to show cause why a new trial should not be granted, the district judge assigned the following reasons for refusing it:    ·

" The motion for a new trial is urged on the ground that plaintiffs themselves committed the first wrong, in omitting to inform defendants of their proceedings, from 7 March until the 27th, and, therefore, cannot complain of the defendants for taking a like liberty. This matter was urged on the trial, and I gave it full attention, but I did not notice it in the reasons for judgment as it appeared to be accounted for by the testimony of the plaintiffs' clerk, who deposed that during this time the regular packets had ceased running. The statement struck me as extraordinary, but when the evidence was closed and no proof offered by the adverse party, I did not feel at liberty, on my own knowledge that boats are departing for the cotton-shipping ports almost daily during a great portion of the year, to assume the fact, during those particular twenty days, in contradiction of the statement under oath of a credible witness. It was a matter of fact, and it was open to defendants to have shown the contrary. Had such neglect been clearly made out, I should not have deduced the consequences from it which the defendants do.

" No doubt the plaintiffs were in duty bound to give prompt information of their doings, and the consequence would be, if they did not do so, a liability for all damage their principals might sustain, but not an exemption of the defendants from all their duties or responsibilities, still less a compensation of the damage one sustained by that sustained by the opposite party, without regard to amount. *Ward & Co.* were, in this instance, the party exposed to loss by delay. Had the cotton market fallen fifty per cent, or risen as much, defendants had the right to profit by the change, to throw the loss on plaintiffs, or take the profits to themselves. But did it give to defendants the right, on their part, to hold a proposition in suspense until the full event was developed? I think it did not. When defendants received the letter of the 27th they might have replied: we disavow your act, and have nothing to do with your alternative; or as I have said, have availed themselves of the change in the market. But had they

WARD
*v.*
WARFIELD.

returned for answer: we shall await the state of the market until the 9th of May, and then decide. Yet this, in effect, is the course I am urged to sanction."

The plaintiffs, as well as *T. B. Warfield*, one of the defendants, appealed from this judgment.

*Prentiss* and *Finney*, for the plaintiffs, cited 3 Cowen, 281. 4 Mason, 296. 10 Pick. 326. 6 Wend. 103. 3 Peters, 69.

*Josephs* and *W. Christy*, for the defendants.

The judgment of the court was pronounced by

SLIDELL, J. The plaintiffs are cotton factors in New Orleans, and the defendants are owners of a plantation in Mississippi, which appears to have been under the superintendence of *T. B. Warfield*. *Carneal*, one of the owners, resided at Cincinnati. The style of the planting partnership was, *Warfield & Co.*

The object of this action is to hold the defendants for a loss upon a shipment of cotton to Liverpool. The cotton was shipped by the defendants to the plaintiffs, with whom they were in account, for sale. Instead of selling at New Orleans they shipped it to *Castellain & Co.* of Liverpool, obtaining an advance from the New Orleans agents of that house for the full market value at New Orleans, the nett proceeds of which advance, after deducting shipping charges, commission for advances, &c., were passed to the credit of the defendants.

The shipment to Liverpool was made on the 7th March, 1844; and on the 27th March, the plaintiffs addressed to *Warfield & Co.*, at the plantation, the following letter:

"New Orleans, 27th March, 1844.

"MESSRS. WARFIELD & Co.—*Dear Sirs :* We held your cotton until the 7th instant, when we concluded it would be better to ship it to Liverpool, than to sell it here. The market was continually going down, and the heavy and increasing stocks here and in New York, and at all the other ports in the United States, forbid the hope of any advance, at least for months to come. Moreover, the speculation having ceased, the value of cotton here must be regulated by the Liverpool prices. We have no doubt your interest will be promoted by the shipment. We had the cotton valued by one of our best brokers, and, if you prefer not risking the shipment, we will pay you the valuation prices. We do not wish, however, to do so, as we have bought no cotton. and are averse to doing so. That we were right in making the shipment is proven by the fact that, all the lower qualities of cotton can be bought fully half a cent lower than the valuation put on yours. The shipment will reach Liverpool at a favorable moment, and when the stocks will be extremely low in that market, and we hope for a good return from the consignment.

"We obtained an advance to the full valuation of the cotton, with which you are credited; the advance amounted to $15,635 35. 364 bales Highlands mark, weighing 166,003 lbs. ; 71 bales Oak Place, 31,981 lbs.

"We acted for you in this matter as we would have done for ourselves. The only regret we have on the subject is, that we did not sell in December, when prices were higher, or that we did not ship earlier.

"No one, however, believed in the rapid decline of cotton, nor could any reflecting person have supposed, considering the weather we had in November, December, and January, the crops would turn out so large. Independent of the heavy bales, the crop will be beyond all expectation ; already over 1,500,000 bales have been received, and there is yet to come to this port alone over 100,000 more.

"All have been deceived in regard to prices, and none more than you. We

trust, however, the measure adopted by us may bring the proceeds of your crop up to expectation. We send you a price current of the day, referring to which, We are, very truly, yours,

WARD<br>v.<br>WARFIELD.

WARD, JONAS & Co."

On the 12th April, 1844, a letter of similar import was addressed to *Carneal,* at Cincinnati. It is admitted that the letter to *Warfield & Co.* was received by *T. B. Warfield* before the 5 April, 1844, and that to *Carneal* was received by him before the 23 April, 1844. The replies made by them were as follows :

"Cincinnati, April 30th, 1844.

"*Gentlemen:* In your favor of the 12th instant, you say 'our market continued to go down so rapidly with no great hope of improvement, that we concluded to ship your crop to Liverpool, on the 7th of March. We had it valued by one of our best brokers. Although we are averse to owning any cotton, yet as we had not time to consult you, we give you the option of taking the valuation, or letting the shipment go on your own account.' So far as I have interest in the crop, which you know is one-third, I take the valuation of the broker. The *Warfields,* owning the other two-thirds, must decide for themselves.                                         Very truly, yours.

T. D. CARNEAL.

(Addressed) Messrs. Ward, Jonas & Co., New Orleans."

"Cincinnati, May 9th, 1844.

MESSRS. WARD, JONAS & Co., New Orleans.—*Gentlemen :* We have determined to take for our crop the broker's valuation, as furnished *T. D. Carneal,* and yield to you the advantages of the shipment to Liverpool.

THOS. B. & W. J. WARFIELD,

by THOS. B. WARFIELD.

It appears that, on the 28th April, the news per European steamer was received at Cincinnati, announcing a serious decline of cotton in Liverpool, and was published at large in the Cincinnati newspapers on the 29th.

It is assumed in argument by the defendants, and, we think, properly, that the original agency of the plaintiffs was limited to the sale of the consigned property in New Orleans.

The principle is well settled that the obligation of an agent, whose authority is limited by instructions, is, to adhere faithfully to those instructions. If he unnecessarily exceed his commission, or risk his principal's effects without authority, he renders himself responsible to the principal for the consequences of his act. If loss ensue, it furnishes no defence to him that he intended the benefit of his principal. But while this general doctrine may be considered as unquestionable, there are other principles which are equally well settled in the law of agency. Subsequent assent, as between principal and agent, is equivalent to a previous authority; and hence where an agent has committed a breach of orders, and the principal, with full knowledge of all the consequences, adopts his acts, even for a moment, he will be bound by them, and the agent will be discharged. Nor it is necessary that such assent should be express. It may be inferred from the conduct of the principal. Hence the rule, so frequently acted upon by courts of justice, that is to be found embodied in all modern treatises, that, when the principal has employed his factor, either to buy or to sell, and the factor, acting in good faith, has departed from the instructions, and has so informed his principal, the principal is bound to notify his rejection within a reasonable time after intelligence received, otherwise, he will be presumed to have adopted the transaction, and the loss, if any, will fall on him.

WARD
*v.*
WARFIELD.

A very pertinent illustration of this rule is found in the case of *Prince* v. *Clark*, 1 Barnwall and Cresswell, 186. *Prince* shipped goods on board of au Indiaman, at London, bound to Calcutta, of which *Clark* was the captain, and *Coffin* the purser. He consigned the goods to them, and directed them to invest the proceeds in certain specified articles, or in bills at the exchange of the day. They sold the goods at Calcutta and invested the proceeds in sugar, which was not one of the articles specified in the instructions, and informed their principal of the purchase by a letter, which he received on the 29th May. They alleged the rate of exchange, as the reason of deviating from his instructions. They had no commercial establishment in England ; but, by a memorandum on a promissory note given by them to *Prince*, before they sailed for India, it appeared that one *Leigh*, of London, had acted as their agent in some insurance transactions, and was the brother-in-law of *Clark*, a fact which the plaintiff knew. On the 7th August, *Prince* notified *Leigh* that he would not accept the sugars, and advised him to insure them. *Leigh* declined to interfere, alleging that he had no knowledge of any transactions between the parties. The vessel in which the sugar was shipped was lost off the Cape of Good Hope, in June, but the intelligence was not received in London, until the 26th August. Upon these facts it was held, in an action by *Prince* against *Clark* to recover the proceeds of the goods shipped to him, that the jury were warranted in finding that *Prince* had assented to the purchase of the sugar. There was a general verdict for the defendant, and *Abbott*, C. J., upon a motion by the plaintiff for a new trial, said, the plaintiff was not bound to accept the sugar. It was his duty, however, to notify his rejection of it within a reasonable time after he received the intelligence of the purchase, if there was any person here to whom the notice could be given. The jury here found, upon the evidence submitted to them, that *Leigh* was a person to whom notice ought have been given, and that it was not given within a reasonable time. *Bayley*, J. said, the principal has no right to pause, and *to wait the fluctuation of the market in order to ascertain whether the purchase is likely to be beneficial or prejudicial ;* he is bound, if he dissents, to notify his determination within a reasonable time, provided he has an opportunity of doing so. He thought it was the plaintiff's business to make inquiry whether *Clark* and *Coffin* had an agent in London, and that his neglect to do so, for two months, was evidence to go to the jury to show that he acquiesced in the purchase of the sugar. *Holroyd*, J. thought that, the jury might fairly infer, from the facts of the case, that the plaintiff did once assent to take the cargo on his own account, or *that he meant at least to take the chance of the market.* That they might presume that something had happened between the 29th May and the 7th August, to alter the intentions which he had once formed.

Now, in the present case, the plaintiffs appear to have acted in good faith, and with a desire to promote the interest of their principals ; and they informed *Warfield*, one of the partners, of what they had done, and of their motive for doing so. He gets this letter at least as early as the 5th April, and makes no answer until the 9th May. Under the well settled rule it was his duty to answer in a reasonable time, and the question is, was this acting within a reasonable time. We do not feel disposed to say that we would be obliged to hold a planter to the same promptitude as a merchant. His situation, habits, and means of deliberation, are not the same. But we cannot but think with the judge below, that, the length of this delay, on the part of *Warfield*, was very suspicious. It looks very much like waiting the fluctuation of the market, to get the certainty whether the shipment to Europe would be beneficial or prejudicial.

In morals this does not seem fair towards a party who had acted in good faith for what he supposed the interest of his employer; and, for that reason, the law does not permit it.

The case is less free from difficulty as to *Carneal.* The plaintiffs say that notice to *Warfield* was notice to him. This is questionable ; but it is not necessary to decide that point. We think, under the circumstances, that, even if we ought not to hold the notice binding upon *Carneal* as of the 5th April, it is fair to conclude, under the evidence, that it was communicated to him by his partner before the 22d April, at which date, if not sooner, the plaintiffs' direct communication reached him. At all events he waited seven days, and the coincidence of the date of his letter and of the publication, at Cincinnati, of the European news of the decline of cotton, is an unfavorable one. It is very difficult to resist the impression that, both the defendants purposely postponed their replies until they could get such advice from Europe as would enable them to make their choice, with a certainty of having the best of the bargain. Suppose, on receipt of the plaintiffs' communication of what he had done, the defendants had at once replied : " You have disobeyed our orders, and now we shall wait intelligence from Europe, and either take the shipment or repudiate it, as we shall then deem most advisable." Certainly they would have been held to the shipment. Yet their procrastination and silence have, we think, virtually placed them in that position. The relation of principal and agent is one of mutual confidence, candor, and good faith. See Paley on Agency, 4, 31. Russell on Factors and Brokers, 26, and the cases there cited. Troplong, Mandat, § 611 *et seq.* Civil Code 1805, 1811, 2979.

It was objected by the defendants that their factors had been guilty of negligence, in not advising them immediately of the shipment. If any injury had occurred to the defendants by the delay, the plaintiffs would have been responsible for its consequences. But no injury has been shown, and we cannot perceive how a negligence of the factor, which did the principals no harm, should work an exemption of the defendants from the responsibility subsequently arising from their own conduct.

The district judge gave judgment against *Warfield,* but released *Carneal,* upon the ground that, although his delay to answer, and then replying only after the arrival of the steamer's news, were very suspicious circumstances, yet that it was to be inferred from an account subsequently rendered by the plaintiffs, on the 1 June, 1844. in which a sum was carried to his private account, that they had assent d to the choice made by him in his letter of May 30th. We are not prepared to assent to this inference. The account, in question appears to us to be made, upon the basis of the shipment to Liverpool being for account of the defendants. The plaintiffs credited the amount of the nett proceeds of the cash advance made by the New Orleans agent of the Liverpool consignees, various deductions having been made for shipping charges and commissions on advance, &c. The credit was stated in these words: "March 12. By nett proceeds of cash advance received of *Messrs. Charles & Klingender,* shipment of four hundred and thirty five bales cotton, to *Messrs. H. Castellain & Co.* Liverpool, per ship Maranham, for your acccount and risk, per statement rendered you, viz : &c." The credit of $1640 given to *Carneal* individually, was the result of a balance thus produced. If, instead of crediting a sum arising from the credit of the nett proceeds of cash advances received from the english agent, the plaintiffs had credited *Carneal* upon the basis of the broker's valua-

WARD
*v.*
WARFIELD.

tion, the alternative proposed in the plaintiffs' letter, then the inference of acquiescence made by the district judge would have been tenable.

We are of opinion that, under the evidence, the plaintiffs may be considered as not contemplating the solidary liability of *Carneal*, but as regarding him as interested for one third in the cotton.

It is, therefore, decreed that, the judgment against *Warfield* be affirmed ; and it is further decreed that, the judgment as to *Carneal* be reversed, and that the plaintiffs recover of said *Carneal* the sum of $1321 63, with interest from the 29 September, 1846, until paid, and costs in the court below, and it is further decreed that the defendants pay the costs of this appeal.