**No. 773**

**First Circuit**

---

**SENTELL v. ROBERTS**

---

(June 16, 1931. Opinion and Decree.)
(October 7, 1931. Rehearing Refused.)

---

Albin Provosty, of New Roads, attorney for plaintiff, appellant.

Bouanchaud & Kearney, of New Roads, attorneys for defendant, appellee.

LeBLANC, J. Plaintiff sues the defendant to recover of him the sum of $1,000.

He alleges that, through the representations made to him by the defendant who was his personal friend and family physician, and after much solicitation on his part, because of his trust and confidence in him, and also because of his assurance that he personally would invest the sum of $10,000, he was finally prevailed upon, on November 24, 1925, to give him his check for the sum of $1,000, with the understanding that the proceeds were to be invested for him in the reorganization of the Pointe Coupee Trust & Savings Bank which was then in a failing condition. He alleges that on November 27, 1925, the defendant, after having indorsed the check which was payable to his order, cashed it at the Bank of New Roads on which it was drawn, and received the proceeds therefor in cash. He then alleges that on January 14, 1926, the Pointe Coupee Trust & Savings Bank closed its doors and sus-

pended business, and has never since reopened, nor has it ever been reorganized as represented to him by the defendant. He avers on belief, that the defendant failed to carry out the plan of reorganization as represented to him, and that it really was never seriously promoted by him, and that at any rate he has never received from the defendant any bank stock or other consideration for the $1,000 he gave him, nor has he ever rendered any account of what he did with his money, although he has been persistently requested to do so.

The answer of the defendant is to the effect that he was prompted by a civic desire, after having been approached by some of the officials of the failing bank, to avert, if possible, the financial disaster which the closing of the bank would mean to the community, and therefore interested himself in trying to promote a rehabilitation of its finances. With that end in view, he became a stockholder in the bank to the extent of one share, having no interest before save that of a small checking account, became a director, and was from then on actively engaged in the effort being made to save the insolvent institution. He avers that he put up $3,950 of his money along with the plaintiff's $1,000, that there were many other contributors besides them, and that all the money so received was to be used in such manner as to take care of the impaired capital stock of the bank, with the understanding that, when a reorganization would be effected, all contributors to this fund would receive stock in the reorganized bank, in proportion to the amount put up by each. All of this was done with the full knowledge of the facts by plaintiff, who he says was a shrewd business man of more than average ability, and he denies that he influenced or persuaded him in any way in making the investment. As their plans progressed, he alleges that it was further decided by the board of directors to levy an assessment against the outstanding stock, in addition to the other contributions already made, and that, when this became generally known and a few stockholders refused to pay their assessment, pending the efforts of the board of directors, the depositors began to make heavy withdrawals which they were unable to prevent, and it then became necessary for the board, realizing the futility of further action, to order the closing of the bank. Defendant avers that he was in no way responsible for the failure of the bank or the materialization of the plans made to re-establish it on a sound financial basis, and suffered the loss of the amount personally contributed by himself. He consequently denies that he is indebted in any way to the plaintiff.

The foregoing synopsis, somewhat long because of the length of the pleadings, serves to bring out the sharp issue of fact which this case presents, as there can be no question in law, that it was the defendant's duty to use and invest the plaintiff's $1,000 under the specific terms of the agreement and understanding between them at the time he was intrusted with the money. If that agreement was that the money was to be invested in the reorganization of a new bank and that the plaintiff was to receive stock therein as a consideration, and the defendant violated his trust by turning the money into a fund created to re-establish the depleted finances of a failing bank, it is elementary that he is liable for the amount thus intrusted to his care. On the other hand, if the understanding was that the money was to be used in taking care of the impaired capital stock of the bank with the hope of

.placing it on a safe financial footing, after which he would receive stock in proportion to the amount he had put in, and the bank afterwards failed through no lack of effort and work on the part of defendant, then of course plaintiff cannot recover.

The district judge merely held that the plaintiff had not carried the burden of proof which the law imposed on him to show that the agreement was as he contended, and rejected his demand. From a judgment dismissing his suit, he has appealed.

The plaintiff, according to the testimony, seems to be a man of more than average intelligence and business ability. Whilst he is not a graduate of that institution, he was a student for four years at the Louisiana State University. He is 39 years old, married, and has a family. He is the almost exclusive owner of an automobile business in New Roads which does an annual business of approximately $150,000. He was not a stockholder nor was he a depositor in the Pointe Coupee Trust & Savings Bank, but had a line of credit there ranging from $2,000 to $4,000. He testifies that he knew of the weakened condition of that bank, and, from his business connections and the almost public information concerning its affairs, it is reasonable to assume that he was familiar with the situation then existing.

The defendant, a man 44 years of age, is a practicing physician in the parish of Pointe Coupee. He is married also and has a family. His testimony shows that he is highly educated and we would judge of no small business acumen. Neither did he have any financial interest in the Pointe Coupee Trust & Savings Bank until November 18, 1925, at which time, actuated, as he says he was, by civic motives to avoid a bank failure in the community, he became the owner of one share of stock of the par value of $100, but for which he actually paid only $25.

We have depicted the character of these two men to show how difficult it is to accept the word of the one as against that of the other. Necessarily, under such a situation, courts have to resort to an analysis of the testimony as a whole and a careful consideration of the surrounding circumstances.

The close attention which we have given to the record leads us to a belief that the facts and circumstances favor the plaintiff and consequently to a different conclusion than that reached by the trial judge.

We have, as our most important consideration, plaintiff's total lack of interest in the financial condition of the Pointe Coupee Trust & Savings Bank. The mere fact that he received some borrowing accommodation at times was not a sufficient inducement from a business standpoint, as we believe, for him to contribute $1,000 towards maintaining its solvency. The proof is that he had equal accommodations at another bank in New Roads in which he had his checking account. Defendant would have it appear that plaintiff was actuated by the same impulse of civic pride as he was in trying to avert a bank failure in the community. Plaintiff, however, says he was not, having no interest whatever in the bank, and besides, had he been prompted by the same noble spirit, as much as he would have cared to assist in the effort being made, it is hardly likely that he would have incurred the obligation he was forced to by having to borrow the $1,000 he gave to the defendant. The latter, on

the other hand, granting his purpose to have been altruistic, seems to have been nursing the ambition to become an active officer in the new management, if indeed not the president of the bank, and it is not unreasonable to assume that he made representations to those he approached on the proposition of rehabilitation of the bank, which were not as conservative as those that would have been made by one less interested. This is shown by his persistency in trying to prevail upon the plaintiff to join him in his efforts and his statements not only to the plaintiff but to others that he was going to put $10,000 of his own money in the plan he had for the reorganization of the bank.

The defendant contends that the plaintiff was fully aware of the condition of the bank, that he knew at the time there was an assessment being levied against the stockholders to replenish its resources, and that contributions were being sought from other sources, and his check for $1,000 was voluntarily given in rehabilitating the condition of the bank. But it does not seem that plaintiff understood that his money was to be used in making up the amount levied against the stockholders, and it is shown that his $1,000 was the only new money with that of the defendant, which was used to bolster up the finances of the bank.

It appears that, for over eighteen months before the failure of the bank, its financial structure was by no means safe, as about that time it had already become necessary for the directors to contribute the sum of $18,000 to help out in the situation. During the month of November, 1925, that amount having been exhausted, it became necessary to find $27,000 more to take care of certain papers which had been charged off by the bank examiner. Taking into account the $18,000 previously contributed and the $27,000 which were required, it developed that the stockholders were faced with a 75 per cent depletion of the capital of the bank, which had to be made good if the institution was to survive at all. It was then the plan for an assessment of that amount against the outstanding stock was proposed and agreed upon. It was then also that the defendant became interested, with the lofty purpose in mind of sparing the community a bank failure, and purchased a share of stock, was elected a member of the board of directors and became vice-president of the bank. His interest resulted in his obtaining plaintiff's check for $1,000. This was on November 24, 1925. He cashed the check a day or two after he received it and retained the proceeds until December 1st or 2d, on either of which days he turned them over with his $3,950 to the assistant cashier of the bank, without obtaining any acknowledgment or receipt whatsoever. The assistant cashier then placed the money to the credit of the undivided profits account of the bank, and that is the last anything seems to be known of it.

In the meantime, while the plans were being worked out, there arose some question as to their legality, and it became necessary to consult Judge Samuel Laycock in Baton Rouge. The depositors became alarmed and began withdrawing funds from the bank, and the plans, instead of progressing with the success that had been anticipated, seemed to be meeting just the opposite result. Nevertheless, we find the defendant, as late as December 31, 1925, reporting to the plaintiff according to his own testimony, that he had not yet put up his money, nor any of his own. When we consider that it was only two weeks follow-

ing this report made by him that the bank closed its doors, and that he necessarily must have had knowledge of the actual condition existing, and when we consider further his failure thereafter· to tell the plaintiff what had become of his money except to say that it was lost, it can hardly be said that the defendant acted with good faith toward the plaintiff. All of this lends weight to the testimony of the plaintiff, who maintains most positively that he turned over his money to the defendant with the understanding between them, that it was going to be used in a plan to reorganize the bank and that he was going to get stock therein after it would have been put on a safe financial footing. He states further that he trusted the defendant not to use his money until he (the defendant) would have put up the $10,000 he promised to invest in the reorganization. Much is said in argument regarding the latter's failure in that respect. Counsel for plaintiff seems to attach much importance to such failure as a further breach of the agreement under which his client turned over his $1,000, and counsel for defendant passes over it lightly by saying that, had the defendant put up the $10,000, it would not have made any difference, as even that amount would not have prevented the bank's failure. The defendant's failure to put up all of the $10,000 plaintiff expected he would can very well be considered as adding weight to the plaintiff's testimony, but to our minds it is somewhat aside of the real issue in the case, which is: What did the defendant do with the plaintiff's $1,000? It was his duty as agent to execute the will of his principal, which was that the money be invested in a reorganization of the bank, and obtain that much stock for it. This he did not do, and he must therefore be held liable. Rev. Civ. Code, arts. 3003, 3010.

"The obligations of an agent, whose authority is limited by instructions, is, to adhere faithfully to those instructions. If he unnecessarily exceed his commission, or risk the effects of his principal without authority, he renders himself responsible to the latter for the consequences of his act. If loss ensue it is no defence that he intended the benefit of his principal." Ward et al. v. Warfield et al., 3 La. Ann. 468; Cuggy v. Zeller, 132 La. 222, 61 So. 209.

A militating circumstance against the plaintiff is that he let four years go by before bringing· this suit, seemingly on a stale demand, and this is strongly urged by counsel for defendant as a weakness of the claim. It is true the plaintiff might have been more vigilant, but, when we take into consideration the standing of the two men in the community and their personal and friendly relation in the past, the reason given by the plaintiff, which is to the effect that he thought any fair-minded man (and evidently he considered the defendant such) would have rendered him an accounting of what had become of his money, stands as a plausible explanation of the delay. At any rate, the staleness of the demand of itself is by no means enough to overcome the other facts and circumstances in the case, which in our opinion favor it.

For these reasons, it is ordered that the judgment ·of the lower court which rejected plaintiff's demand and dismissed his suit be now reversed, annulled, and set aside; and it is further ordered that there be judgment in favor of the plaintiff, James H. Sentell, and against the defendant, Dr. James C. Roberts, in the full and entire sum of $1,000 with legal interest thereon from the 27th day of November, 1925, until paid, and all costs of this proceeding in both courts.